## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**LEONARD E. ADAMS II,**                )
                                        )
      **Plaintiff,**                )
                                        )
      **v.**                       )    **Civil Action No.**
                                        )    **06-40117-FDS**
**FRANK G. COUSINS, JR.; JOSEPH**       )
**FURNARI; ESSEX COUNTY SHERIFF'S**     )
**DEPARTMENT; MR. HENNESSEY;**          )
**MICHAEL MARKS; KEVIN ANDERSON;**      )
**BARBARA KOWALSKI; LUIS AYALA;**       )
**KATHLEEN M. DENNEHY;**                )
**MASSACHUSETTS DEPARTMENT**            )
**OF CORRECTION; PUBLIC**               )
**EMPLOYEE JOHN DOE(S); and**           )
**INMATE JOHN DOE(S),**                 )
                                        )
      **Defendants.**              )
_____)

## MEMORANDUM AND ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

      This is a civil rights action brought by a former inmate of a correctional facility against

various state agencies and employees.  Plaintiff Leonard E. Adams II alleges that he was attacked

by other inmates while incarcerated at the Lawrence Correctional Alternative Center.  Adams has

brought suit against the Essex County Sheriff's Department; Sheriff Frank G. Cousins, Jr.; several

Sheriff's Department employees; the Commissioner of the Massachusetts Department of

Corrections;[1] and several inmates.   In essence, Adams alleges that the Sheriff's Department knew

that his confinement in the facility threatened his safety, as he was the victim of an earlier inmate

_____

[1] Commissioner Kathleen Dennehy, the named defendant, has since been replaced by Harold W. Clarke.

attack and had received multiple threats of harm.

The eleven-count complaint asserts claims under 42 U.S.C. § 1983 for deprivation of constitutional rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments (Count 1); violation of the Eighth Amendment prohibition on cruel and unusual punishment (Count 2); violation of plaintiff's Fourteenth Amendment due process rights (Count 3); violation of plaintiff's Fourteenth Amendment liberty interests (Count 4); negligent failure to supervise (Count 5); negligent failure to train (Count 6); civil assault (against inmate defendant Ayala only) (Count 7); conspiracy to commit assault (Count 8); relief under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 2 (Count 9); violation of the Massachusetts Civil Rights statute, Mass. Gen. Laws ch.12, §§ 11H and 11I  (Count 10); and maintenance of an unconstitutional custom and/or practice (Count 11).

The Sheriff's Department and its employee defendants—Sheriff Frank Cousins, Joseph Furnari, Michael Marks, Kevin Anderson, and Barbara Kowalski—have moved for summary judgment as to all claims against them.  For the reasons set forth below, the motion will be granted in part and denied in part.

## I.   Factual Background

Except where noted, the following facts are presented in the light most favorable to the plaintiff.

### A.   Adams's Incarceration and Transfer to CAC

At some point in 2001 or 2002, Leonard Adams was arrested and charged with a domestic violence crime.  He was sentenced to one year of probation and advised that he would serve six months committed time in the event of a violation.  As a result of a later altercation, Adams was

found to have violated the terms of his probation.  In April 2003, he was sentenced to serve six months in a correctional facility.

Adams was originally assigned to the Essex County Correctional Facility in Middleton, Massachusetts.  Approximately three weeks later, he was transferred to the Lawrence Correctional Alternative Center ("CAC") in Lawrence, Massachusetts, ostensibly for consideration of his release upon electronic monitoring.[2]  According to Adams, the issue of his release was to be taken up at a hearing scheduled for May 19, 2003.  That hearing, however, was cancelled.[3]

The CAC is located on a large campus with three buildings surrounded by a fence.  One of the three buildings, the Annex, is a 24-bunk dormitory unit.  Adams was housed in the Annex.  The Annex is known as the "new-man section" because that is where new prisoners are assigned.  (Anderson Dep. 24:13-15).  The CAC facility in Lawrence is an "open campus," meaning that all inmates are held in general population.  (Furnari Dep. 28:11-13).

### B.    The First Attack and Transfer Back to Middleton

In the Annex during the evening of May 21, 2003, Adams was attacked by two inmates who had accused him of paying too much attention to their female visitors.  The entire incident was over in less than a minute.

Although he was segregated as a precautionary measure after the attack, at some point Adams was apparently nonetheless put in a position to identify his assailants in front of other

---

[2] Although inmates were occasionally released from Middleton on a bracelet, the normal procedure was to go to the CAC first.  (Furnari Dep. 36:4-10).

[3] It is not clear whether the hearing was ever rescheduled.  Plaintiff asserts, without supporting documentation, that the hearing was rescheduled to a date when he was unable to be present.  *See* Pl.'s 56.1 Stmt. at ¶ 4.

inmates.  He identified his attackers as Jim Izquierdo and George Sanchez.

As a result of the May 21 attack, Adams was transferred back to Middleton for his own protection.  He was placed in protective custody for one day and then sent to 60 Block. Izquierdo and Sanchez were also transferred to Middleton.  With Adams back in Middleton, defendant Kevin Anderson, the deputy in charge of inmate classification and records at CAC, did not do any follow-up investigation regarding the incident or the parties involved.[4]

In Middleton, Adams told a corrections officer—whose name he does not know—that one of the perpetrators of the May 21 attack was on his block and that he was concerned because the assailant was in a gang and had friends who could also pose a threat.  Several hours later, the assailant that Adams had identified was transferred—a development that, according to Adams, did not go unnoticed by the other inmates.  After that, other inmates began harassing him.

On June 11, 2003, Adams reported serious threats of bodily injury to Sean Hennessey, a corrections officer.[5]  He also told Hennessey that he wanted to file a grievance and that he needed to be protected.  Adams says he received an anonymous "death threat" written on a piece of paper and left on his bed.  According to Adams, "It said – roughly in words like you are a rat and that if you do not leave, you are going to be killed."  (Adams Dep. 23:21-24:10).

As a result of the threatening note, and in response to fears of further violence, Adams was reclassified to the 120A unit, or "the hole," for administrative segregation.  (Adams Dep. 23:16-17, 25:16).  He remained there for about a week before he was transferred back to CAC.

---

[4] Anderson would later write a report that included details of the first attack, but he could not remember how he learned those details.  (Anderson Dep. 19:6-20:17).

[5] The complaint names a "Mr. Hennessey" as a defendant, without further identification.

4

At Middleton, Adams made several attempts to communicate his concerns about his safety to various corrections officers.  Officer Hennessey was apparently responsive.  "There was also – Hennessey also.  I told him.  I talked to him.  I told him everything.  That's why he felt it was more important to get me out of there, put me in the hole."  Other officers, however, were less so.  While he was in the 120A unit, Adams says he dealt with another officer.  "I wrote a letter, almost a grievance and all, and he just ripped it up.  I don't remember his name."  (Adams Dep. 28:8-11).[6]  According to Adams, the letter that was ripped up stated that he did not want to return to CAC and that he was worried for his life.  (Adams Dep. 33:22-34:5).  He does not remember if he reported the destruction of his letter to anyone at the time.[7]

Adams complained about his situation in written letters.  His letters, however, were deemed insufficient to constitute a proper grievance.  He was not provided with official forms or otherwise advised how to perfect a grievance.

On June 13, 2003, Adams filed a "Request to Speak Form."  The form, addressed to "Classification," stated:  "I am requesting that I may speak to classification at their earliest convenience.  I was suppose [sic] to go to [CAC] on 6-13-03 and didn't.  I would like to know my status and options."  Later that day, he was informed he was being transferred back to CAC.  He testified that upon learning of his impending transfer, he told corrections officers that his

---

[6] Plaintiff's account of his attempts to file grievances and alert county officials to his safety concerns, both in the Local Rule 56.1 Statement he submitted and at his deposition, are hazy, difficult to follow, and apparently inconsistent.  This problem is compounded by the fact that Adams seems either to combine incidents or speak about one incident as if it occurred repeatedly.  Keeping the narrative straight is also made difficult because Adams resorts to the pronoun "they" frequently when he does not remember the specific names of the corrections officers with whom he dealt.  Thus, it is not clear how many times or with how many different officers plaintiff is contending that he raised these issues.

[7] He did, however, testify that he did not include a report of this incident in a letter written after the second assault because he feared it would only make his life inside harder.  (Adams Dep. 35:8-12).

transfer to CAC was not a good idea and that he was not safe in either place.  (Adams Dep. 27:14-19).[8]

### C.      The Transfer Back to CAC

Notwithstanding his concerns, his transfer to the CAC went forward.  Upon returning to the CAC on June 16, 2003, Adams was greeted by Kevin Anderson and Jodi Holmes, who were conducting intake classification for new inmates from Middleton.[9]

According to Anderson, he reviewed the circumstances of the first assault with Adams and asked him if he had any problems during his intervening stay at Middleton, if he had any potential enemies at CAC, and whether he was comfortable being at CAC.  Adams told Anderson that one of his attackers approached him in the 60 Unit at Middleton and threatened him, saying that he would not be safe anywhere.  Anderson asked if the attackers had put the word out to any of their friends at the CAC; Adams responded that he did not know.  Anderson told Adams to come forward if he was approached or threatened by anyone and that he would be returned to Middleton for his safety.  Adams indicated that he understood.[10]

Adams does not dispute the substance of Anderson's account of his intake classification upon his return to CAC, but contends that his account is incomplete.  According to Adams, Anderson also stated that he doubted anyone would hassle him because no one at CAC wanted to

---

[8]  Adams does not recall to whom specifically he addressed these concerns.  (*See also id*., 29:11-12) ("At all times, I was definitely worried about my safety, no matter where I was.").

[9]  Anderson was both director of records and director of classification, which are apparently combined in the same position at CAC.  (Furnari Dep. 37:11-22).  Holmes was a counselor.

[10]  Inmate classification policies and procedures include a practice of identifying "keep-aways," inmates who need to be separated to prevent conflict.  The intake process did not lead to the formal identification of any keep-aways.

go back to Middleton.  Adams also says that he told Anderson that he was "really scared about

being here" and that he did not "think [he] should be here."  (Adams Dep. 37:18-19).  Most

significantly, Adams says he told Anderson he had potential enemies at the jail.  (Adams Dep.

47:10-15).

Adams would have preferred to be sent back to protective custody in Middleton.  He

acknowledges, however, that he did not mention that fact during his intake classification on June

16.  (Adams Dep. 37:22-38:4).[11]  Protective custody is not an option at CAC because all inmates

are housed in general population.

### D.    The Second Attack

In the early morning of June 17, 2003, Adams was sleeping on the top bunk in his room at

the Annex with the covers over his head when he was awakened by blows to his face and head.

He opened his eyes to see four Hispanic men, three armed with broomsticks, beating him.[12]

Adams recognized one of the men as Luis Ayala, the inmate assigned to the bunk immediately

below his own.  None of the men had been involved in the first assault.  Adams was struck

multiple times, including blows to his jaw and eye.  He raised his arms in defense to fend off the

blows.  Adams jumped out of bed to defend himself and the three assailants fled up the stairs.  He

gave chase briefly but the men disappeared.  Bleeding profusely, he returned to his room,

collected his possessions from his foot locker, and walked down the stairs to find a corrections

---

[11] Anderson testified that if Adams had come to him and said he had enemies, he would have been sent back to protective custody at Middleton.  (Anderson Dep. 33:9-12) ("If an inmate – any inmate comes to me of concern of their safety, it's my job to protect them.  I send them back to Middleton for protective custody.").

[12] The number of assailants varies across accounts and reports; the difference is immaterial for purposes of deciding this motion.  This account comes from plaintiff's deposition.  (*See* Adams Dep. 40:1-5).

officer.

At approximately 6:25 a.m., Adams came to the front desk of the Annex asking for medical attention.  A Sergeant Healy, who was apparently stationed at the desk, ordered a lockdown of the Annex and escorted Adams to the nurse's station.  While being treated in the infirmary, he and defendant Furnari, then the Assistant Superintendent at CAC, briefly discussed the incident.

Adams was then transported to the Lawrence General Hospital.  He remained in the hospital for about a week, where he was treated for a broken jaw and multiple facial lacerations.

After his discharge from the hospital, Adams returned to Middleton briefly.  After several days, he was brought to Worcester for placement on electronic bracelet monitoring.

Adams ultimately completed his sentence without further incident.

## II.    Procedural Background

Defendants Cousins, Furnari, Marks, Anderson, Kowalski and the Sheriff's Department are the only parties to have answered the complaint.  Those defendants have moved for summary judgment.

Two threshold problems must be noted before turning to the merits of the motion.

### A.    The Lack of a Local Rule 56.1 Statement

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56(c).  Nonetheless, defendants have failed to file the statement of material facts required by Local Rule 56.1.  The statement of facts included in defendants' memorandum of law is cursory, and does not even purport to fulfill their obligation under the local rule.  Indeed, defendants' brief recap of the facts cites almost exclusively to the allegations in plaintiff's complaint, not to any actual

evidence.  The Court could deny the motion for this reason alone.

Plaintiff's approach is also seriously flawed.  Plaintiff's Local Rule 56.1 statement is unclear and disorganized, making it difficult to establish even the bare outlines of what plaintiff believes occurred.  Plaintiff, too, supports certain factual assertions in his statement of facts solely by reference to allegations in the complaint or inadmissible materials.  Defendants did not, however, move to strike these materials or object to the facts plaintiff states in reliance on them.

Despite these infirmities, the Court has nonetheless reviewed the record in its entirety.  It would be grossly inefficient to allow the case to proceed to trial where certain claims against certain defendants are not legally cognizable or adequately supported by the evidence and obviously have no merit.

### B.   The Submission of Inadmissible Evidence

Some of the materials plaintiff attached to his Local Rule  56.1 Statement of Facts—particularly Exhibit 4 (Arlene Smith's June 18, 2003 letter to Cousins) and Exhibit 5 (Adams's August 7, 2003 grievance letter to defendant Marks)—contain substantial amounts of inadmissible hearsay.[13]  They may, of course, be admissible for other purposes (for example, to show that certain defendants were on notice of certain issues), but not for the truth of the matters asserted therein.

"Generally speaking, evidence must be admissible at trial in order to be considered on summary judgment."  *Goguen v. Textron, Inc.*, 234 F.R.D. 13, 16 (D. Mass. 2006) (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990)).  This rule applies to the moving party *and* the opposing party.  "In opposing a motion for summary judgment, a plaintiff must

---

[13] Smith was Adams's fiancée at the time.

9

proffer *admissible evidence* that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition." *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 475-76 (1st Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (emphasis added). The letters offered by plaintiff are hearsay and contain statements that are themselves hearsay that may or may not be subject to an exception. "Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." *SEC v. Ficken*, 546 F.3d 45, 53 (1st Cir. 2008) (quoting *Garside*, 895 F.2d at 50).

Defendants, however, have not objected to either letter. If defendants opposed the use of these materials, they should have moved to strike the exhibits or otherwise objected to their inclusion. There is, however, no "rigid rule requiring a motion to strike in order to preserve an objection to the admissibility of evidence in connection with a summary judgment motion." *Asociacion de Periodistas de P.R. v. Mueller*, 529 F.3d 52, 57 n.1 (1st Cir. 2008) (internal citation, quotation, and original textual alteration omitted).

It would be grossly inefficient to permit a claim to survive summary judgment on the basis of inadmissible hearsay, only to have the evidence excluded at trial. Accordingly, and under the circumstances, the Court will not accept Exhibits 4 and 5 for the truth of any matter asserted therein.

**III.   <u>Analysis</u>**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the

potential of affecting the outcome of the case." *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855 (1st Cir. 2008) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)). "The starting point is to canvass the evidence in the light most flattering to the nonmovant, drawing all reasonable inferences in that party's favor." *Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 56 (1st Cir. 2008).

Plaintiff has sued a multitude of defendants on a multitude of claims, but has done little to defend those claims on summary judgment. Some are clearly barred as a matter of law, and others fail for lack of evidence. The Court will begin its analysis with the claims subject to Eleventh Amendment immunity.

### A.     Claims Subject to Eleventh Amendment Immunity

### 1.     Claims Against the Essex County Sheriff's Department

Plaintiff's claims against the Essex County Sheriff's Department are barred by the Eleventh Amendment. Essex County was dissolved as a separate legal entity in 1999. *See* Mass. Gen. Laws ch. 34B, § 1; *see also Cape Cod Times v. Sheriff of Barnstable County*, 443 Mass. 587, 588 n.4 (2005). As a consequence, all former offices and departments of Essex County are now state agencies. *See Kelley v. DiPaola*, 379 F. Supp. 2d 96, 100 (D. Mass. 2005). As a state agency, the Sheriff's Department is protected by the state's immunity from suit under the Eleventh Amendment, unless that immunity is waived. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) ("Absent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court.'") (quoting *Welch v. Texas Dep't of Highways and Public Transp.*, 483 U.S. 468 (1987)).

Under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 2, the

Commonwealth has waived sovereign immunity for certain suits, but only in the Superior Court. Mass. Gen. Laws ch. 258, § 3. The Commonwealth has not consented to be sued in federal courts. *Irwin v. Commissioner of Dep't of Youth Servs.*, 388 Mass. 810, 819-20 (1983).[14] Summary judgment will therefore be granted as to all claims against the Essex County Sheriff's Department.

## 2.    Claims Against Defendants in Their Official Capacities

Similarly, summary judgment will be granted as to all claims against all defendants in their official capacities.[15] Just as the Sheriff's Department is a state agency, its employees are state employees. Suits against public employees in their official capacities are treated as suits against the public employer, here the Commonwealth of Massachusetts. *See Chute v. City of Cambridge*, 201 F.R.D. 27, 29 (D. Mass. 2001) ("It is well settled that filing a civil action against a city official in that person's official capacity is simply another way of suing the city itself."). As explained above, the state is immune from suit in federal court.[16] Thus, all claims against the officers in their official capacities and against the Sheriff's Department will be dismissed.

## B.    Claims under Section 1983 for Failure to Protect

---

[14] Moreover, to the extent that plaintiff's claims are asserted under 42 U.S.C. § 1983, it is well-settled that "neither a State nor its officers in their representative capacities are 'persons' within the meaning of 42 U.S.C. § 1983 with respect to actions for damages." *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

[15] There is some ambiguity in the complaint as to the capacity in which certain defendants are being sued. Cousins, Furnari, and Marks are specifically listed as defendants in both official and individual capacities. Anderson and Kowalski are listed simply as "public employees." It is not clear what the term "public employee" is intended to mean in this context. The Court will nonetheless construe the complaint liberally to state claims against these defendants in their individual capacities.

[16] *See also Broner v. Flynn*, 311 F. Supp. 2d 227, 233 (D. Mass. 2004) ("[A] Section 1983 suit against [the sheriff] in his official capacity is deemed to be a suit against the Commonwealth. Since a state is not a 'person' for purposes of Section 1983, all claims against [the sheriff] in his official capacity are barred.") (citing *Forte v. Sullivan*, 935 F.2d 1, 2 n. 2 (1st Cir. 1991)).

Plaintiff's claims under 42 U.S.C. § 1983 are something of a tangled knot.  Count 1 alleges deprivation of constitutional rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments in violation of 42 U.S.C. § 1983.  Counts 2, 3, and 4 also allege violations of the Eighth Amendment, the Fourteenth Amendment ("due process"), and the Fourteenth Amendment ("liberty interest"), respectively.  Plaintiff does not indicate how these claims differ from one another.  In fact, they appear to be entirely redundant.

To the extent that plaintiff is asserting that prison officials failed to protect him from attacks by other inmates, he is clearly asserting an Eighth Amendment claim.  *See Cookish v. Commissioner, N.H. Dep't of Corr.*, 1992 U.S. App. LEXIS 32138, at *3-*4 (1st Cir. Dec. 8, 1992) (per curiam).[17]  The "liberty interest" and substantive due process rights that he is asserting appear to be essentially identical to the Eighth Amendment claim.[18]  His opposition memorandum does not discuss the Fourth Amendment claim, and it is impossible to ascertain the nature of that claim from the complaint.[19]  Accordingly, the Court will address the § 1983 claims set forth in Counts 1 through 4 as arising under the Eighth Amendment as incorporated by the Fourteenth Amendment.

---

[17] "The Eighth Amendment applies to state action through the Fourteenth Amendment." *Giroux v. Somerset County*, 178 F.3d 28, 32 (1st Cir. 1999) (citing *Robinson v. California*, 370 U.S. 660 (1962)).

[18] Plaintiff's opposition memorandum refers to a "liberty interest in bodily security" (Pl. Opp. at 11). Similarly, the complaint asserts a "Due Process" violation for failure "to provide plaintiff adequate protection from threats of serious bodily harm by prisoners."  (Compl. ¶ 56).

[19] In his opposition memorandum, plaintiff appears to try to introduce several new theories of recovery. He recasts the due process claim of Count 3 as a procedural due process claim, citing the "failure to provide notice, hearing an[d] a fair opportunity to secure his safety prior to release into general population."  (Pl. Opp. at 11-12). The opposition also marks the initial appearances of a First Amendment claim and what appears to be an equal protection claim.  (Pl. Opp. at 7, 11, & 12).  Plaintiff is "not entitled to raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment."  *Calvi v. Knox County*, 470 F.3d 422, 431 (1st Cir. 2006) (citing *Torres-Rios v. LPS Lab*, 152 F.3d 11, 15-16 (1st Cir. 1998)).  The Court declines to consider the merits of any such newly-raised claims.

Under the Eighth Amendment, "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). "However, not every injury suffered by a prisoner at the hands of a fellow inmate gives rise to an Eighth Amendment claim. In order for a prison-conditions complaint to state a violation of the Eighth Amendment, two requirements must be met." *Giroux v. Somerset County*, 178 F.3d 28, 32 (1st Cir. 1999). First, "the alleged deprivation of adequate conditions must be objectively serious, i.e., 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.'" *Giroux*, 178 F.3d at 32 (quoting *Farmer*, 511 U.S. at 834). Given the serious injuries Adams sustained as a result of the second attack, there is no real question that the first requirement is met. Second, "the official involved must have had 'a sufficiently culpable state of mind,' described as 'deliberate indifference' to inmate health or safety." *Giroux*, 178 F.3d at 32 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). Thus, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 839.

To satisfy the "deliberate indifference" standard, plaintiff must produce evidence specific to each individual defendant. "[T]here is no respondeat superior liability under section 1983." *Ayala-Rodriguez v. Rullan*, 511 F.3d 232, 236 (1st Cir. 2007) (citing *Rizzo v. Goode*, 423 U.S. 362, 375-77 (1976)). "Absent evidence of participation, concerted action, or at least culpable knowledge, one officer cannot be held jointly liable under section 1983 for another officer's

14

[unconstitutional conduct]."  *Calvi v. Knox County*, 470 F.3d 422, 429 (1st Cir. 2006).

With the exception of Anderson, plaintiff has failed to satisfy this standard as to any of the moving defendants on the Eighth Amendment claim.

### 1.    Sheriff Frank Cousins

Frank G. Cousins, Jr., is the Sheriff of Essex County.  There is no evidence that Sheriff Cousins had any direct involvement in the classification or placement of Adams, or any awareness of his situation prior to the second attack.[20]  There is thus simply no basis for any claim against Cousins under § 1983 for failure to protect.  *See Burrell v. Hampshire County*, 307 F.3d 1, 7 n.4 (1st Cir. 2002).  Summary judgment will therefore be granted as to that claim.

### 2.    Michael Marks

Michael Marks is the Superintendent of the Essex County Correctional Facility.  There is no evidence that Marks had any personal involvement in the incidents giving rise to this action; indeed, his name is not mentioned even once in plaintiff's statement of facts.  There is no basis for any claim against Marks under § 1983 for failure to protect.  Summary judgment will therefore be granted as to that claim.

### 3.    Barbara Kowalski

 From the scant information in the record, it appears that Barbara Kowalski is Sheriff Cousins's secretary.  (Furnari Dep. 66:4-18).[21]  There is absolutely no evidence, and indeed not

---

[20] In his statement of material facts, plaintiff asserts that his then-fiancée Smith communicated with the defendants, including defendant Cousins, in May and June 2003.  (Pl. 56.1 Stmt. at ¶ 13).  However, according to the evidence in the record, she did not communicate with him until June 18, 2003, one day *after* the second attack.

[21] There appears to be confusion concerning the proper spelling of this party's name.  Documents filed by both sides alternate inconsistently between "Kowalski," "Kowolski," and "Kowalsi."

even a bare allegation, that Kowalski failed in any of her duties as the Sheriff's secretary.  There is

no basis for any claim against Kowalski under § 1983 for failure to protect.  Summary judgment

will therefore be granted as to that claim.

### 4.    Kevin Anderson

Kevin Anderson was in charge of initial classification on intake to CAC.  (Furnari Dep.

37:23-38:3).  According to Adams, Anderson was aware of the first attack, knew of Adams's

safety concerns, and was in a position to place him where he would be less vulnerable.  Without

highlighting every detail, there appear to be material issues of disputed fact as to what Anderson

knew of the nature of the risk to Adams and whether he responded reasonably under the

circumstances.

The reasonableness of any response by a prison official can only be evaluated in relation to

the official's notice of the risk.  *See Burrell*, 307 F.3d at 8 ("[T]he prison officials' behavior was

not unreasonable *when considered within the context of what they knew* . . . .  The focus is on

what the jailers knew and what they did in response.") (emphasis added).[22]  "Conceivably, a

response that was colorable and taken in good faith might still be enough to negate deliberate

indifference even if it were inadequate from an objective standpoint (and thus negligent)."  *Id.*

Knowledge of risk may be inferred; if the prison official "understood that there was a high

probability of a danger to [the inmate], he would not escape liability if the evidence showed that

he merely declined to confirm inferences of risk that he strongly suspected to exist (as when a

prison official is aware of a high probability of facts indicating that one prisoner has planned an

---

[22] The same court cautioned that "[a]ny inquiry into the reasonableness of the prison officials' actions 'incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions.'"  307 F.3d at 8 (quoting *Farmer*, 511 U.S. at 845).

16

attack on another but resists opportunities to obtain final confirmation)." *Giroux*, 178 F.3d at 33

(quoting *Farmer*, 511 U.S. at 843 n.8) (original textual alteration and internal quotation omitted).

Here, as in *Giroux*, "the summary judgment record supports the inference that [defendant]

was aware of a high probability that [plaintiff] was vulnerable to attack from another inmate."

178 F.3d at 33.  Although Anderson arguably took some action in response to his awareness of

the risk, a reasonable juror could find that it was his "responsibility" at that point "to confirm the

basis" for Adams's apprehensions "and to alert the employees on his shift to that basis, in order to

reasonably protect the inmates in his custody.  A juror could find that . . . abdication of his

responsibility, in the face of such a known danger to [an inmate's] safety, was a reckless

dereliction of duty rising to the level of Eighth Amendment deliberate indifference."  *Id.* at 34.

In short, "a reasonable juror, on the basis of the summary judgment record, could

conclude that [Anderson] 'knew that [Adams] faced a substantial risk of serious harm and

disregarded that risk by failing to take reasonable measures to abate it.'" *Giroux*, 178 F.3d at 32-

33 (quoting *Farmer*, 511 U.S. at 847).  This is not to say that plaintiff has proved his case, but

only that there are material disputed facts as to this claim.  This is *not* a case where "[u]nder the

totality of circumstances known to the prison officials, no jury could reasonably find that the

officials had responded unreasonably." *Burrell*, 307 F.3d at 9.

Nor do the facts presented establish that Anderson is entitled to qualified immunity on this

claim.

> We use a three-part test to determine whether an official is entitled to qualified
> immunity, following the guidance provided by the Supreme Court.  The threshold
> inquiry is whether the plaintiff's allegations, if true, establish a constitutional
> violation.  The second question is whether the right was clearly established at the
> time of the alleged violation.  That inquiry is necessary because officers should be

on notice that their conduct is unlawful before they are subject to suit.  The third is whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right.

*Suboh v. District Attorney's Office*, 298 F.3d 81, 90 (1st Cir. 2002) (internal citations omitted).

The existence of disputed material facts can make resolution of a defendant's entitlement to qualified immunity difficult in the context of summary judgment.  This difficulty has been recognized by the First Circuit:

> [T]he summary judgment standard requires absolute deference to the nonmovant's factual assertions . . . whereas qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken, actions of the movant. In order to ease this inherent tension, we think it wise for courts to cabin these standards and keep them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful.

*Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009) (internal citations omitted).

With that framework in mind, the Court concludes that Anderson is not entitled to qualified immunity at this time.  It is well-established that "[p]rison officials have a duty under the 8th and 14th amendments to protect prisoners from violence at the hands of other prisoners." *Cortes-Quinones*, 842 F.2d at 558 (internal quotation omitted) (citing cases).  Thus, under the circumstances, any objectively reasonable, similarly situated prison official would have known that Adams required some form of protective measure.[23]

Summary judgment will therefore be denied as to Anderson on the Eighth Amendment claim.

---

[23] This determination does not preclude Anderson from raising the issue again after a jury has made its factual findings, in a special verdict form if necessary.  *See Wilson v. City of Boston*, 421 F.3d 45, 53 n.10 (1st Cir. 2005); *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002) ("A tool used to apportion the jury and court functions relating to qualified immunity issues in cases that go to trial is special interrogatories to the jury.").

### 5.   Joseph Furnari

At the time of the second attack, Furnari was the assistant superintendent at CAC.

Furnari was already aware of the first attack in May 2003, before the return transfer to CAC.

However, there is no admissible evidence that Furnari had any direct contact with Adams prior to

the second attack or that he was in any way personally involved in his reclassification to CAC, or

that he was even aware that such a reclassification had taken place.  Thus, despite knowing that

he had been attacked once, there is no evidence that Furnari knew that Adams had an ongoing

fear for his safety at CAC.[24]  Accordingly, summary judgment will be granted as to Furnari as to

the Eighth Amendment claim.

### C.   Claims under § 1983 for Failure to Supervise or Train

Plaintiff also asserts claims under § 1983 against various defendants for failure to

supervise and failure to train.

### 1.   Failure to Supervise

Under § 1983, courts have treated claims for both failure to supervise and failure to train

under the general category of supervisory liability.  "Supervisory liability can be grounded on

either the supervisor's direct participation in the unconstitutional conduct, or through conduct

that amounts to condonation or tacit authorization."  *Whitfield v. Melendez-Rivera*, 431 F.3d 1,

14 (1st Cir. 2005) (citing *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)).

Courts "have set forth three elements necessary to establish supervisory liability under §

1983:  (1) that the supervisor had actual or constructive knowledge that his subordinate was

---

[24] Smith's inadmissible letter describes telephone conversations with Furnari concerning the first attack, but there is no admissible evidence that such a conversation occurred.

engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (collecting cases) (internal quotations omitted).[25] "'When a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for a prisoner's safety.'" *Giroux*, 178 F.3d at 34 (quoting *Rondon Pinto v. Jimenez Nettleship*, 737 F.2d 130, 132 (1st Cir. 1984)).

There is no evidence in the record concerning who supervises whom among plaintiff's extensive list of defendants. As the only defendant who had personal contact with Adams prior to the second assault, Anderson is the only defendant who can properly be said to have participated in any conduct that *directly* affected plaintiff one way or the other. Ostensibly, therefore, it was Anderson who was not adequately supervised or trained by other defendants.[26] Thus, if there is to be any supervisory liability in this case, plaintiff will have to show, among other things, actual or constructive notice and deliberate indifference or tacit authorization by at least one of the other

---

[25] "Absent direct participation, a supervisor may only be held liable where '(1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence . . . amounting to deliberate indifference.'" *Whitfield*, 431 F.3d at 14 (quoting *Hegarty v. Somerset County*, 53 F.3d 1367, 1379-80 (1st Cir. 1995)) (additional internal quotation omitted).

[26] Obviously, Anderson cannot be liable for failure to supervise himself. *Cf. Shirback v. Lantz*, 2008 U.S. Dist. LEXIS 25840, at *10-*11 n.4 (D. Conn. Mar. 28, 2008) (assuming that consecutive counts for "failure to provide adequate medical care" and "supervisory liability for failure to provide adequate medical care" against the same defendants are redundant and dismissing the former).

defendants.

There is simply no evidence of any kind to support a supervisory liability claim against Cousins, Marks, or Kowalski.  Although Furnari appears to have been Anderson's actual supervisor, or at least his superior officer, plaintiff has failed to point to any evidence showing Furnari's knowledge of any unconstitutional conduct by Anderson (or anyone else), or any deliberate indifference to or condonation of that offensive conduct, or that there was a causal link between anything Furnari did or did not do and the injury Adams suffered.  Accordingly, summary judgment will be granted as to all claims against defendants for failure to supervise.

## 2.    Failure to Train

As a general matter, a policy of inadequate training can serve as a  basis for § 1983 liability if the "failure to train 'amounts to deliberate indifference to the rights of persons with whom the [law enforcement officers] come into contact.'"  *Whitfield*, 431 F.3d at 9-10 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "Deliberate indifference" will be found if there is a lack of adequate training "notwithstanding an obvious likelihood that inadequate training will result in the violation of constitutional rights." *Id.*  The plaintiff must also prove that the deficiency in training actually caused the deliberate indifference to the public's constitutional rights. *Id.*

Failure-to-train claims are typically brought against municipal defendants or other entities, not individuals.  Nonetheless, "a supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citing *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806, 807

(8th Cir. 1994)); *see also Shirback*, 2008 U.S. Dist. LEXIS 25840, at *13-*14  n.5 ("It appears

to the court that the standard for 'deliberate indifference' as an element of a claim for municipal

liability [for failure to train or supervise] is the same as the standard for 'deliberate indifference or

gross negligence' as an element of a claim of personal liability.")

Plaintiff does not specify in the complaint which defendants were allegedly responsible for

the inadequate training and which ones were inadequately trained.[27]  In his opposition

memorandum, plaintiff appears to impute the failure collectively to all defendants, while singling

out defendant Cousins for particular blame:

> Plaintiff claims that defendants failure to train, supervise and investigate
> employee(s) error or misconduct in this case demonstrates the nature of the
> policies in place at the time and substantially caused plaintiff to suffer injury.
> Sheriff Cousins failure to ensure the completion a reasonable investigation of this
> matter is evidence of the policies and practices that existed at the time.

(Pl. Opp. at 4).  Conclusory statements in a brief are not evidence, and are not sufficient to defeat

summary judgment.  Assuming, however, that Anderson was the trainee and that one or more of

the defendants were the trainers, plaintiff's claim still fails.

Plaintiff has produced no evidence of *any* deficiency in training, let alone sufficient

evidence to prove the "actual causation" requirement under the law.  In *City of Canton*, the

Supreme Court emphasized that "the focus must be on adequacy of the training program in

relation to the tasks the particular officers must perform."  489 U.S. at 390.  In order to assess the

---

[27] *See Kelley*, 379 F. Supp. 2d at 101 ("The complaint refers generally to the 'defendants' without specifying for which acts or omissions Sheriff DiPaola and Superintendent Norton are allegedly responsible. Indeed, aside from their inclusion under the title 'parties' on the first page of the complaint, their names are not even mentioned.  Thus, plaintiff has provided no facts (or evidence) upon which Sheriff DiPaola and Superintendent Norton could be held directly liable for any of the conditions of which plaintiff has complained and they are entitled to summary judgment.").

adequacy of the training program, *some* evidence concerning the training program is surely required.  There are only passing references to training in the record; the most comprehensive testimony came from Peter Cignetti, a special investigator in the Essex County investigations unit.  Cignetti testified that under the department's policies and procedures, there is a practice of categorizing certain inmates as "keep-aways"; that he is required to exercise discretion in keeping those people apart for the safety of the inmates; and that he has been trained accordingly.

This evidence falls woefully short of proving a claim for failure to train.  Plaintiff is required to specify the ways in which the training received by Anderson "was inadequate" and demonstrate that the "training was inferior by the standards of the profession."  *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1160 (1st Cir. 1989)).  "A generalized showing of a deficient training program is not sufficient.  The plaintiff must establish that the particular officers who committed the violation had been deprived of adequate training, and that this specific failure in training was at least a partial cause of the ultimate injury."  *Whitfield*, 431 F.3d at 9-10 (citing *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005)).[28]

Plaintiff may be under the impression that the fact that he was attacked is sufficient evidence of defendants' failure to train and supervise.  It is not.  *See Shirback*, 2008 U.S. Dist. LEXIS 25840, at *12.  Nor is the fact that a subordinate may have done something wrong.  As

---

[28] In *Whitfield*, the First Circuit concluded that "[b]ecause the plaintiffs failed to provide sufficient evidence establishing that [the] police officers were inadequately trained, it follows that the plaintiffs failed to prove that the mayor and the police commissioner were deliberately, recklessly or callously indifferent to the constitutional rights of the citizens."  Here, Adams has presented no evidence concerning the training that Anderson did or did not receive.  Thus, as in *Whitfield*, "[t]he plaintiff[] failed to show that there were any training deficiencies, much less that the [supervisory defendants] 'should have known that there were . . . training problems.'"  431 F.3d at 14 (quoting *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994)).

the Supreme Court explained, "plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [defendant] liable. . . . [O]fficers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances." *City of Canton*, 489 U.S. at 391.

In summary, plaintiff has produced insufficient evidence to support a claim for failure to train against any moving defendant. Summary judgment will therefore be granted as to those claims.

### D.   Claim for "Unconstitutional Practice and/or Custom"

Plaintiff also purports to state a claim for "Maintenance of Unconstitutional Practice and/or Custom." (Compl. at Count 11).[29] The maintenance of certain institutional policies, or the failure to implement policies where needed, may constitute a constitutional violation under some circumstances. For example, a lack of a classification system to segregate violent and non-violent prisoners may be part of an Eighth Amendment violation. *Burrell*, 307 F.3d at 10 (citing *Calderon-Ortiz v. Laboy-Alvarado*, 300 F.3d 60, 65-66 (1st Cir. 2002)).

Here, the uncontroverted evidence shows that both Middleton and CAC maintained classification systems and policies, such as the "keep away" policy, designed to protect the safety of the inmates. Plaintiff does not dispute that fact; indeed, he himself submitted evidence of the system and policies. He has not pointed to any constitutional flaw in the systems or policies

---

[29] Again, plaintiff does not specify which defendants are implicated by this claim. The complaint refers to "Policymaking officials of the public employers" and "county policymakers." (Compl. ¶¶ 84, 85). In any event, the overwhelming weight of the evidence precludes liability on this claim against *any* defendant. The complaint also refers to a custom of retaliating against prisoners who file grievances. There is no evidence to support this allegation. Similarly, a reference in plaintiff's opposition memorandum to improper posting of guards is entirely unsupported in the record.

themselves.  He therefore cannot credibly contend that CAC and Middleton *lack* a classification

system or relevant policies, or that the system and policies are inadequate on their face.

Plaintiff may be claiming that defendants failed in his case to adhere to their system and

policies concerning inmate safety.  He has not, however, offered any such evidence, other than the

circumstances of his own case.  "Absent evidence of an unconstitutional . . .  policy, a single

incident of misconduct cannot provide the basis for . . . liability under § 1983."  *Fabiano v.*

*Hopkins*, 352 F.3d 447, 452 (1st Cir. 2003) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808,

823-24 (1985)).

Summary judgment will therefore be granted as to all defendants on Count 11.

**E.**     **Claim for Conspiracy to Commit Assault**

In Count 8, plaintiff alleges that Ayala and the other inmates who attacked him "were

acting in concert and potential [*sic*] in tacit agreement with certain defendant public employees

who on June 17, 2003, had left their post and or the immediate area at approximately 7:00 a.m.,

thereby substantially causing the violent attack upon plaintiff while they were gone."  (Compl. ¶

74).  Plaintiff did not indicate in the complaint whether this claim is brought under federal or state

law.  He did not address the claim in his opposition memorandum, and produced no evidence in

its support.  And there appears to be no evidence in the record of any agreement or collusion

between the inmates and the officials, tacit or otherwise.  Summary judgment will therefore be

granted to all moving defendants as to Count 8.

**F.**     **Claims under State Law**

**1.**     **Massachusetts Tort Claims Act**

Count 9 asserts a claim under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch.

258, § 2, for conduct by defendants that he contends amounts to "gross negligence." Again, plaintiff fails to specify the defendants against whom he intends to assert this claim. However, that omission makes little difference. Section 2 of the Tort Claims Act creates a cause of action only against "public employers." The statute explicitly exempts individual employees from liability: "no such public employee or the estate of such public employee shall be liable for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment." Mass. Gen. Laws ch. 258, § 2. Thus, "'a public employee is immune from a claim arising out of gross negligence because such a claim qualifies as a "negligent or wrongful act or omission" under § 2.'" *Monahan v. Methuen*, 408 Mass. 381, 392 (1990) (quoting *McNamara v. Honeyman*, 406 Mass. 43, 46 (1989)). As in *Monahan*, the individual defendants in this case are immune from personal liability, even for their allegedly grossly negligent conduct. 408 Mass. at 392. Summary judgment will therefore be granted to all moving defendants as to Count 9.

## 2.    **Massachusetts Civil Rights Act**

Count 10 asserts a claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11H. "In order to make out a claim under [the MCRA], the plaintiff must prove that the defendants used 'threats, intimidation or coercion' to interfere with, or attempt to interfere with, rights secured by the Constitution or laws of the United States or the Commonwealth of Massachusetts." *Brum v. Town of Dartmouth*, 428 Mass. 684, 707-08 (1999). Plaintiff has produced no evidence of threats, intimidation or coercion by any moving defendant. Summary judgment will therefore be granted to all moving defendants as to Count 10.

## IV.    **Conclusion**

26

For the reasons stated above, defendants' motion for summary judgment is granted in all respects, except insofar as Count 1 states a claim under the Eighth and Fourteenth Amendments against defendant Anderson.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 31, 2009